Filed 6/29/21; Certified for Publication 7/27/21 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| JONATHAN FISHER,<br><br>　　　Plaintiff and Respondent,<br><br>　　　　　　v.<br><br>MONEYGRAM INTERNATIONAL, INC.,<br><br>　　　Defendant and Appellant. | A158168<br><br>(Alameda County Super. Ct. No. RG19009280) |

In this case we assess the validity of an arbitration provision in a consumer adhesion contract that reduces the length of the statute of limitations, invokes the application of the arbitrators' higher commercial fees, and requires consumers to bear their own costs and fees for experts and attorneys.  We conclude the arbitration provision is unconscionable largely because it was hidden on the back side of a money transfer order form, in tiny 6-point print that we deem virtually illegible.  Because the arbitration provision operated largely to benefit defendant MoneyGram International, Inc. (MoneyGram) at plaintiff Jonathan Fisher's expense, we affirm the superior court's order denying MoneyGram's petition to compel arbitration.

1

# I.  BACKGROUND

## A. *The MoneyGram Transactions and the Arbitration Provision*

MoneyGram is a global financial company that enables customers to transfer money to various locations in the United States and around the world.  Consumers can make MoneyGram transactions online, through a mobile platform or kiosk, or at an agent location in retail stores such as Walmart.

On February 17 and 18, 2016, Jonathan Fisher, a 63-year-old Vietnam War-era Veteran with poor eyesight, initiated money transfers at two different Walmart stores in California, the first for $2,000 to a recipient in Rockmart, Georgia, and the second for $1,530 to a recipient in Baton Rouge, Louisiana.  In order to proceed with the transactions, Fisher was required to complete a MoneyGram Money Transfer Form (Send Form), which requests information regarding the sender, amount to be sent, receiver, destination and receiving options.  MoneyGram processed Fisher's money transfer requests, and the funds were delivered to the intended recipients.  On neither of these occasions did Fisher turn over the Send Form and try to read the Terms and Conditions on the reverse, which included an arbitration requirement (Arbitration Provision).  But even if he had tried to read the tiny print, he would not have been able to do so—even wearing his trifocal glasses—at least not without a magnifying glass.

The Arbitration Provision is reproduced below, and in a larger context, in the appendices to this opinion:[1]

---

[1] An actual-size reproduction of the full Terms and Conditions examined by Fisher's expert witness, whose testimony we discuss below, is attached as appendix A.  An English-language version of the Terms and Conditions filed by MoneyGram in superior court is attached as appendix B. (See fn. 2, *post*.)  Both appendices include a ruler to establish the paper size

2

ARBITRATION. UNLESS OTHERWISE SPECIFIED BY APPLICABLE LAW, ANY CONTROVERSY OR CLAIM ARISING OUT OF OR RELATING TO THE TRANSFER, THE AGREEMENT OR BREACH OF THIS AGREEMENT, INCLUDING STATUTORY CONSUMER CLAIMS, SHALL BE SETTLED BY ARBITRATION ADMINISTERED BY THE AMERICAN ARBITRATION ASSOCIATION ("AAA") UNDER ITS COMMERCIAL ARBITRATION RULES. JUDGMENT ON THE ARBITRATION AWARD MAY BE ENTERED IN ANY COURT HAVING JURISDICTION THEREOF. ANY SUCH ARBITRATION SHALL BE INITIATED AND HELD IN THE OFFICE OF THE AAA CLOSEST TO THE AGENT LOCATION WHERE YOU INITIATED THE TRANSFER. EACH PARTY SHALL BEAR ITS OWN COSTS AND FEES FOR EXPERTS AND ATTORNEYS, AND NO PARTY SHALL HAVE A RIGHT TO PARTICIPATE AS A MEMBER OF ANY CLASS OF CLAIMANTS. THIS EXCLUSIVE ARBITRATION REMEDY SHALL NOT BE AVAILABLE UNLESS INITIATED WITHIN ONE YEAR AFTER THE CONTROVERSY OR CLAIM AROSE.

## B. *The Lawsuit*

Fisher sued MoneyGram in March 2019, claiming that the two money transfers he completed in February 2016 were induced by a "scammer," and that MoneyGram knew its system was used by scammers but failed to warn or protect Fisher from "the scheme he had fallen victim to." The scheme was for the scammer to promise the victim a large sum of money (lottery winnings, inheritances, grants, loans or other financial benefits) if only the victim would send a comparatively small sum to the scammer, said to represent taxes, import fees, or some other concocted story.

Fisher alleged that MoneyGram's funds transfer service was used frequently in fraudulent transactions because under MoneyGram's policies the money would be immediately available upon transfer to the scammer at a Walmart store or other MoneyGram outlet. Other money transfer services, such as bank transfers, place a temporary hold on the funds to discourage or prevent fraudulent transactions. In fact, Fisher alleged, MoneyGram was so remiss in protecting its customers from fraud that it had been the subject of a Federal Trade Commission (FTC) permanent injunction since October 21, 2009, requiring it to establish, implement, and maintain a comprehensive anti-fraud program to protect its consumers. (*Federal Trade Commission v. MoneyGram International, Inc.* (N.D.Ill., Oct. 21, 2009, No. 09-cv-6576) ECF No. 13.) But Fisher claims MoneyGram failed to abide by the injunction.

---

of the original even if publishing constraints should require resizing. In appendix B, the original document included a Spanish translation in a second column, making the block of print twice as wide as the appendix indicates.

The complaint alleges that MoneyGram (1) failed to disclose "fraud occurring via its service[s]" as well as information necessary to detect and avoid such fraud; (2) knew that its system was being used to defraud consumers and failed to take steps to protect such consumers; and (3) failed to comply with the FTC order enjoining such steps be taken. Based on these allegations, Fisher purports to represent a class of "all other similarly situated persons who transferred money while in California using MoneyGram's money transfer service pursuant to a fraudulent scheme . . . since October 20, 2009." The complaint asserts one cause of action under the unfair competition law (UCL). (Bus. & Prof. Code, § 17200 et seq.) The complaint seeks restitution, injunctive and declaratory or other equitable relief, as well as attorney fees and costs under Code of Civil Procedure section 1021.5.

## C. *The Petition To Compel Arbitration*

In May 2019, MoneyGram petitioned to compel arbitration, and Fisher opposed the petition, arguing the agreement to arbitrate was invalid for two reasons. First, Fisher argued that no agreement to arbitrate was formed because MoneyGram did not obtain Fisher's informed consent to its terms. Second, Fisher argued that the Arbitration Provision was unenforceable because it was both procedurally and substantively unconscionable. In reply, MoneyGram contended that a valid agreement to arbitrate existed with no procedural or substantive unconscionability. MoneyGram also requested that the court sever any provisions deemed unenforceable.

On August 16, 2019, Judge Winifred Y. Smith of Alameda County Superior Court held a hearing and issued a written order denying MoneyGram's petition to compel arbitration. The court ruled the Arbitration Provision was unenforceable as both procedurally and substantively unconscionable, and it declined to sever any provision. The court ruled, first,

4

that the Arbitration Provision's "6 point font," placement "on the back side of the Send Form," and "take it or leave it nature" were "indication[s]" of procedural unconscionability.  Second, the court ruled that the Arbitration Provision's "one year statute of limitations," "requirement that any plaintiff pay the [American Arbitration Association (AAA)] commercial arbitration costs and fees," and the "waiver of attorneys' fees" were substantively unconscionable "in the aggregate," and that it "could not sever these three provisions because to do so would make material changes in the agreement as a whole."

Given its ruling on the unconscionability issue, the court did not address Fisher's additional argument that no valid contract had been formed. (See *Domestic Linen Supply Co., Inc. v. L J T Flowers, Inc.* (2020) 58 Cal.App.5th 180, 185 [court held no arbitration agreement had been formed where arbitration clause was buried in a "thicket of fine print" on a back page of the contract, after the signature line].)

MoneyGram appealed.  (Code Civ. Proc., § 1294, subd. (a).)

## II.  DISCUSSION

### A. *What the Contract Says*

For those who had trouble reading the Arbitration Provision as presented to Fisher and replicated above, we quote the text again in our normal 13-point typeface:

> "**ARBITRATION.** UNLESS OTHERWISE SPECIFIED BY APPLICABLE LAW, ANY CONTROVERSY OR CLAIM ARISING OUT OF OR RELATING TO THE TRANSFER, THE AGREEMENT OR BREACH OF THIS AGREEMENT, INCLUDING STATUTORY CONSUMER CLAIMS, SHALL BE SETTLED BY ARBITRATION ADMINISTERED BY THE AMERICAN ARBITRATION ASSOCIATION ("AAA") UNDER

5

ITS COMMERCIAL ARBITRATION RULES. JUDGMENT ON THE ARBITRATION AWARD MAY BE ENTERED IN ANY COURT HAVING JURISDICTION THEREOF. ANY SUCH ARBITRATION SHALL BE INITIATED AND HELD IN THE OFFICE OF THE AAA CLOSEST TO THE AGENT LOCATION WHERE YOU INITIATED THE TRANSFER. EACH PARTY SHALL BEAR ITS OWN COSTS AND FEES FOR EXPERTS AND ATTORNEYS, AND NO PARTY SHALL HAVE A RIGHT TO PARTICIPATE AS A MEMBER OF ANY CLASS OF CLAIMANTS. THIS EXCLUSIVE ARBITRATION REMEDY SHALL NOT BE AVAILABLE UNLESS INITIATED WITHIN ONE YEAR AFTER THE CONTROVERSY OR CLAIM AROSE."

This, then, is the contract that Judge Smith refused to enforce because she found it both procedurally and substantively unconscionable.

### B. *Unconscionability Doctrine and the Standard of Review*

#### 1. Unconscionability doctrine

" ' "Unconscionability" ' " is commonly defined as " ' "an absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party." ' " (*Sanchez v. Valencia Holding Co., LLC* (2015) 61 Cal.4th 899, 910 (*Sanchez*).) Unconscionability, as the definition suggests, has both a procedural and a substantive element, the former focusing on oppression or surprise due to unequal bargaining power, the latter on overly harsh or one-sided results. (*Carlson v. Home Team Pest Defense, Inc.* (2015) 239 Cal.App.4th 619, 630 (*Carlson*).) " ' "The prevailing view is that [procedural and substantive unconscionability] must both be present in order for a court to exercise its discretion to refuse to enforce a contract or clause under the doctrine of unconscionability." ' " (*Ibid.*) But they need not be present in equal parts.

6

(*Ibid.*) Rather, California courts employ a sliding scale to determine unconscionability, the more substantively oppressive the contract terms, the less evidence of procedural unconscionability is required to conclude the terms are unenforceable, and vice versa. (*Ibid.*; see *Armendariz v. Foundation Health Psychcare Services, Inc.* (2000) 24 Cal.4th 83, 114 (*Armendariz*).)

The unconscionability defense has been recognized by the United States Supreme Court as a general contract defense in California, and therefore a defense to an agreement to arbitrate. (*AT&T Mobility LLC v. Concepcion* (2011) 563 U.S. 333, 341–343; see *De La Torre v. CashCall, Inc.* (2018) 5 Cal.5th 966, 978–979.) Applying the unconscionability defense to an arbitration agreement in California is not preempted by the Federal Arbitration Act (FAA) (9 U.S.C. § 1 et seq.). (*OTO, L.L.C. v. Kho* (2019) 8 Cal.5th 111, 125 (*OTO*); *Sanchez, supra*, 61 Cal.4th at p. 921.)

## 2. The standard of review

In deciding a petition to compel arbitration, "the trial court sits as a trier of fact, weighing all the affidavits, declarations, and other documentary evidence, as well as oral testimony received at the court's discretion, to reach a final determination." (*Engalla v. Permanente Medical Group, Inc.* (1997) 15 Cal.4th 951, 972.) An "order denying a petition to compel arbitration, like any other judgment or order of a lower court, is presumed to be correct, and all intendments and presumptions are indulged to support the order on matters as to which the record is silent." (*Gutierrez v. Autowest, Inc.* (2003) 114 Cal.App.4th 77, 88 (*Gutierrez*).)

" 'There is no uniform standard of review for evaluating an order denying a motion to compel arbitration. [Citation.] If the court's order is based on a decision of fact, then we adopt a substantial evidence standard. [Citations.] Alternatively, if the court's denial rests solely on a decision of

7

law, then a de novo standard of review is employed.' " (*Carlson, supra,* 239 Cal.App.4th at p. 630.)  If material facts are in dispute, " 'we presume the court found every fact and drew every permissible inference necessary to support its judgment.' " (*Ibid.*)

Because unconscionability is a defense to enforcement of a contract, the party challenging the contract has the burden of proof.  (*OTO, supra,* 8 Cal.5th at p. 126; *Sanchez, supra,* 61 Cal.4th at p. 911.)  The ultimate determination of unconscionability, however, is an issue of law, not fact. (Civ. Code, § 1670.5, subd. (a); *Gutierrez, supra,* 114 Cal.App.4th at p. 89.) Thus, " '[a]bsent conflicting extrinsic evidence, the validity of an arbitration clause, including whether it is subject to revocation as unconscionable, is a question of law subject to de novo review.' " (*Swain v. LaserAway Medical Group, Inc.* (2020) 57 Cal.App.5th 59, 66; see *Carlson, supra,* 239 Cal.App.4th at p. 630.)

But factual issues may bear on that determination.  " ' "Thus, to the extent the trial court's determination that the arbitration agreement was unconscionable turned on the resolution of conflicts in the evidence or on factual inferences to be drawn from the evidence, we consider the evidence in the light most favorable to the trial court's ruling and review the trial court's factual determinations under the substantial evidence standard." ' " (*Swain v. LaserAway Medical Group, Inc., supra,* 57 Cal.App.5th at pp. 65–66.)

### C. *Procedural Unconscionability*

To determine whether an arbitration provision satisfies the " 'procedural element of unconscionability,' " courts focus on " 'two factors: oppression and surprise.' " (*Carlson, supra,* 239 Cal.App.4th at p. 631.) Oppression arises from an inequality of bargaining power which results in no real negotiation and " 'an absence of meaningful choice.' " (*Ibid.*)  Surprise involves the extent to which "the supposedly agreed-upon terms of the

8

bargain are hidden in the prolix printed form drafted by the party seeking to enforce the disputed terms." (*A & M Produce Co. v. FMC Corp.* (1982) 135 Cal.App.3d 473, 486.) A showing of either oppression or surprise may render a contract procedurally unconscionable. (*Gutierrez, supra,* 114 Cal.App.4th at p. 89, fn. 8 [oppression not required if surprise proven]; *Nyulassy v. Lockheed Martin Corp.* (2004) 120 Cal.App.4th 1267, 1281 [surprise not necessary if oppression shown].)

### 1. Oppression

#### a. *The Arbitration Provision was an adhesion contract*

The analysis of oppression begins with an examination of the contract itself to determine whether it is a contract of adhesion. An adhesive contract is standardized, generally on a preprinted form, and offered by the party with superior bargaining power " 'on a take-it-or-leave-it basis,' " such as the MoneyGram Send Form. (See *OTO, supra,* 8 Cal.5th at p. 126.) Here, there can be no doubt that an adhesive contract has been proven. Fisher had no bargaining power in the transaction. He was presented with the preprinted Send Form to fill out and sign, with no opportunity to negotiate. The trial court did not make an express finding that the Arbitration Provision was a contract of adhesion, but such a finding is unavoidable.

The fact that the Arbitration Provision is an adhesion contract does not by itself render it unenforceable as unconscionable. (*Serafin v. Balco Properties Ltd., LLC* (2015) 235 Cal.App.4th 165, 179.) An adhesive contract does, however, establish at least some degree of procedural unconscionability and requires us to " 'scrutinize the substantive terms of the contract to ensure they are not manifestly unfair or one-sided.' " (*Sanchez, supra,* 61 Cal.4th at p. 915.)

b. *Fisher was not required to prove a lack of market alternatives*

MoneyGram insists a finding of procedural unconscionability requires more, that "[o]ppression refers not only to an absence of power to negotiate the terms of a contract, but also to the absence of reasonable market alternatives." (*Morris v. Redwood Empire Bancorp* (2005) 128 Cal.App.4th 1305, 1320 (*Morris*).)  The " 'oppression' factor of the procedural element of unconscionability may be defeated, if the complaining party has a meaningful choice of reasonably available alternative sources of supply from which to obtain the desired goods and services free of the terms claimed to be unconscionable." (*Dean Witter Reynolds, Inc. v. Superior Court* (1989) 211 Cal.App.3d 758, 772; *Morris*, *supra*, 128 Cal.App.4th at pp. 1319–1320.)

MoneyGram argues that the superior court erroneously relied on cases involving employment contracts in determining that the Arbitration Provision was procedurally unconscionable, and that consumer contracts are different.  MoneyGram insists the fact that Fisher had a choice of service-providers in the funds transfer business gave him a "meaningful choice" that prevents us from finding Fisher was a victim of oppression.  MoneyGram distinguishes this case from the situation where a patient needs a hospital (*Tunkl v. Regents of University of California* (1963) 60 Cal.2d 92, 94, 99–100 & fn. 13), or an employee is faced with joblessness if he or she refuses to sign an adhesive contract (*Little v. Auto Stiegler, Inc.* (2003) 29 Cal.4th 1064, 1071 [arbitration appeal provision tending to favor employer was unconscionable]; *Armendariz*, *supra*, 24 Cal.4th at p. 115 ["the arbitration agreement stands between the employee and necessary employment, and few employees are in a position to refuse a job because of an arbitration requirement"]).  In such dire situations the plaintiff cannot be expected to "shop around" for an alternative bargain.  (*Morris*, *supra*, 128 Cal.App.4th at p. 1320.)  But in a less pressured commercial environment, such as the money transfer business,

MoneyGram argues Fisher was required to prove a lack of market alternatives. There is no evidence in the record as to the existence or nonexistence of market alternatives with more favorable contract terms.

Our reading of MoneyGram's cited cases suggests this "meaningful choice" rationale is employed only where surprise is not seriously in issue, and the plaintiff relies solely on the defendant's use of an adhesion contract to show procedural unconscionability. For instance, in *Wayne v. Staples, Inc.* (2006) 135 Cal.App.4th 466, the price charged for insurance coverage on shipping was plainly posted, no surprise could be claimed, so the availability of other shipping services not requiring insurance purchase precluded a finding of procedural unconscionability. (*Id.* at pp. 481–482.) "There can be no oppression establishing procedural unconscionability, even assuming unequal bargaining power and an adhesion contract, when the customer has meaningful choices." (*Id.* at p. 482; see, e.g., *Morris*, *supra*, 128 Cal.App.4th at p. 1321 [clear heading in contract identified bank's account termination fee]; *Dean Witter Reynolds, Inc. v. Superior Court*, *supra*, 211 Cal.App.3d at p. 772 ["termination fee [was] not shown to have been hidden from him to such an extent . . . as to establish the 'surprise' factor of the procedural element of unconscionability"]; *Darnaa, LLC v. Google, Inc.* (N.D.Cal., Dec. 2, 2015, No. 15-cv-03221-RMW) 2015 U.S.Dist. Lexis 161791, pp. *7–*8 [YouTube's Terms of Service created only "marginal" procedural unconscionability where the terms were not hidden and performer had other means of publicizing her music video].)

In the present case, however, the Terms and Conditions were hidden on the back of the MoneyGram Send Form, and the Arbitration Provision was obscured by placement within a dense block of mostly undifferentiated text that Fisher could not read even with trifocal lenses. (See appen. A.)

11

Contrary to MoneyGram's suggestion, Fisher was not required to show the absence of market alternatives to establish procedural unconscionability because he had solid evidence of surprise.

In such circumstances, "evidence that one party has overwhelming bargaining power, drafts the contract, and presents it on a take-it-or-leave-it basis is sufficient to demonstrate procedural unconscionability and require the court to reach the question of substantive unconscionability, even if the other party has market alternatives." (*Lona v. Citibank, N.A.* (2011) 202 Cal.App.4th 89, 109 [loan at allegedly unconscionable interest rate]; *Gutierrez, supra,* 114 Cal.App.4th at p. 89, fn. 8 [the existence of market alternatives is irrelevant where procedural unconscionability is based on surprise]; *Szetela v. Discover Bank* (2002) 97 Cal.App.4th 1094, 1100 [availability of alternative providers may be relevant to whether contract is adhesive, but "not the deciding factor" and not "the relevant test for unconscionability"].) Thus, we distinguish the cases cited by MoneyGram for its "meaningful choice" argument and decline to require such a showing by Fisher.

### 2. Surprise

a. *The Arbitration Provision: point size, typeface, and spacing*

Fisher produced in opposition to MoneyGram's petition to compel arbitration a written report by Thomas W. Phinney as an expert witness on typography, typeface identification, and point size, retained to assess point size and legibility of the Arbitration Provision. Phinney had an M.S. degree in graphic arts publishing and more than 20 years' experience working in the typography field. Phinney examined the Arbitration Provision provided to him by Fisher's attorneys and concluded it was virtually illegible based on a confluence of tiny print, faint contrast, thin characters, narrow spacing of words and lines, and exceptionally long lines with practically no margins.

(See appen. A.) Phinney analyzed the typography of the Arbitration Provision in detail, and we accept his expert opinion for its assistance in assessing the readability of the Arbitration Provision.[2]

---

[2] Disagreement emerged in the trial court concerning whether Phinney examined the same version of the Send Form that Fisher signed in 2016. Fisher submitted a declaration that the copy of the Send Form furnished him by counsel (the same version examined by Phinney, attached as appen. A) appeared, so far as he could recall, "similar to the way the . . . Form looked in 2016" when he made the transfers at issue. That form however, had been retrieved from a MoneyGram outlet in July 2019. MoneyGram submitted a different version of the Send Form attached to the declaration of its Legal Affairs Manager, which it identifies as a "true and correct" blank copy of the version signed by Fisher in 2016 (the English-only version of which is attached as appen. B). The version submitted by MoneyGram is visibly longer than the version examined by Phinney. The trial court did not resolve this dispute in its order denying the petition to compel arbitration or elsewhere in the record.

In October 2020, Fisher filed a motion in this court asking us to take evidence on this issue in the form of a right-sized version of the 2016 Send Form. In Fisher's briefing, he accuses MoneyGram of submitting to the trial court an enlarged copy of the Terms and Conditions. MoneyGram admits in its response to Fisher's motion that it *enlarged* the copy of the Terms and Conditions it submitted to the trial court, claiming this was necessary to prevent the substance of the agreement from being "illegible" for the court due to expected degradation in the copying process. The result is that the record contains no right-sized version of the 2016 Send Form. MoneyGram denies an intention to mislead the court, but having to enlarge the agreement to make it legible is a problem in itself in a case like this. Submitting to the trial court a declaration calling this a "true and correct" copy in a case where procedural unconscionability is at issue, largely as a function of font size, may raise ethical concerns better dealt with in the trial court.

We deny the motion for new evidence as one rarely granted and so that this dispute may finish playing out in the trial court. We accept appendix B as a true copy of the substance of the Terms and Conditions in 2016. We do not, however, accept appendix B as a true-to-size copy of the Terms and Conditions. For purposes of this appeal, we accept appendix A as more accurately reflecting the size of the block containing the Terms and

We describe in words what is easier to grasp visually.  The MoneyGram Send Form was a bi-fold pamphlet printed on both sides of a 17-inch by 8.5-inch piece of paper, then folded to consist of four pages, each measuring 8.5 inches by 8.5 inches.  The Terms and Conditions, including the Arbitration Provision, were on the back side of the form.  All the pertinent information to be filled out by the consumer about the transaction was on the front side.  The trial court found, and MoneyGram admits, the Arbitration Provision is printed in 6-point type.  The terms appear in two columns, the left in English and the right in Spanish.  The columns are jammed together in the 8.5-inch by 8.5-inch square with scant margins either between or on the sides.  (See appen. A.)  Phinney identified the font as Myriad Pro Light Condensed, which is light in contrast with exceptionally narrow characters.  At oral argument, MoneyGram's attorney said she did not dispute this font identification.  Phinney concluded, the "Light Condensed style of Myriad . . . is not a great choice for legibility in general and it is particularly problematic at small sizes."  (See appen. A.)

Phinney also noted the spacing between lines of text is smaller than typical.  Default line spacing for 6-point Myriad Pro Light Condensed in programs such as Adobe InDesign and Microsoft Word is 7.2 points.  MoneyGram reduced the line spacing of the Arbitration Provision to 6.4 points.  The terms of the Arbitration Provision consequently have just one-third the space between lines that is provided by default in Word or

---

Conditions, and as reflecting the size of the typeface itself, and the general appearance of the document.  MoneyGram admits in briefing and confirmed at oral argument that the font size of Fisher's contract was 6 points.  To the extent appendix B has new or different wording, it bears on portions of the Terms and Conditions other than the Arbitration Provision, which is identical in both versions.

InDesign.  Phinney calculated that a regular letter-size page with the text parameters of MoneyGram's Terms and Conditions would hold approximately 4,000 words, or some eight times the number on the same size page with normal type size and format.  Phinney summarized, "the Terms & Conditions may be the most challenging-to-read original document I have encountered in my professional work" in more than 20 years of experience in the font industry.  He concluded presentation of MoneyGram's Arbitration Provision in the Terms and Conditions is "a strikingly egregious example of typesetting . . . in disregard of legibility and approachability."

   b.  *Illegible typeface point size:  MoneyGram's position*

Fisher's declaration establishes that he has poor vision and could not read the Terms and Conditions without the aid of a magnifying glass.  MoneyGram attempts to counter Fisher's evidence of surprise with federal district court case law holding that an arbitration provision will be enforced if it is in the same point size as the rest of the agreement.[3]  Such reasoning necessarily has its limits.  The cases cited by MoneyGram are premised on both contracting parties realizing the entire agreement exists and having had an opportunity to review it.  In Fisher's case, his declaration indicates he did not turn over the Send Form and made no attempt to read the Terms and

---

[3] MoneyGram cites *Bauer v. Atlantis Events, Inc.* (C.D.Cal., Mar. 5, 2014, No. CV 13-05290 SJO (JCx)) 2014 WL 12603112, page *3 (plaintiffs did not allege or prove surprise); *Levine v. Millennium Trust Co., LLC* (S.D.Cal., Jan. 24, 2013, No. 12cv2210 JM (JMA)) 2013 WL 12157579, page *4 (applying Illinois law; disputed provision was "not hidden in a maze of fine print"); and *ERG Res., LLC v. CSD Eng'g, Inc.* (C.D.Cal., July 26, 2011, Nos. 11-cv-03966 SVW (Ex), 11-cv-04930 SVW (Ex)) 2011 U.S. Dist. Lexis 164551, page *10, 2011 WL 13220321, page *4 (not a consumer contract; "ERG is a large company that is capable of defending itself in contract negotiations").

Conditions before completing the funds transfers.  MoneyGram's argument, taken to the limit of its logic, would appear to be, because the Arbitration Provision appears in exactly the same typeface, point size and spacing as the rest of the Terms and Conditions, it is shielded from operation of the doctrine of unconscionability, no matter how small or illegible the print.

We cannot agree with such reasoning, for surely the size of the typeface has much to do with how legible the document is and therefore how "surprised" the consumer might be to learn what it says.  When the entire agreement is printed on the back side of the Send Form in a size too small to read without a magnifying glass, the idea that the size of the other terms justifies the size of the Arbitration Provision must be rejected.  Deliberately choosing a tiny, difficult to read typeface must have some bearing on whether the party with superior bargaining power has taken unfair advantage of its contracting counterpart.  As Judge Smith found, the font size is a "significant factor" in the unconscionability determination.

MoneyGram admits the Arbitration Provision is in 6-point type but claims there is no minimum point size for arbitration agreements, and any such rule this court might adopt would be preempted by the FAA.  We announce no such across-the-board rule, but we do observe in this case that 6-point typeface is extremely difficult to read and contributes significantly to the surprise element we find here.

c.  *Illegible typeface point size:  statutes and rules of court*

As illustrated on page 3, *ante*, 6-point type is exceedingly small.  Some comparisons of type sizes regulated by statute or otherwise are useful to establish a baseline expectation for legibility.  For instance, the Judicial Council of California, for practice in the Court of Appeal, has decided that 13-point typeface is most legible (Cal. Rules of Court, rule 8.204(b)(4)), while in the trial courts 12-point type is minimally acceptable (*id.*, rule 2.104).

Judge Smith, in her order denying MoneyGram's petition, listed several California statutes requiring "minimum font sizes" larger than 6-point "for various consumer purposes," including retail installment contracts (Civ. Code, § 1803.1 [8-point]), gift certificates (Civ. Code, § 1749.5 [10-point]), written statements to prospective borrowers (Fin. Code, § 22603 [10-point]), certain electronic media political advertisements (Gov. Code, § 84504.3 [8-point]), safety labels on portable gasoline containers (Health & Saf. Code, § 13139 [8-point or 12-point, depending on size of container]), and information cards for sexual assault victims (Pen. Code, § 680.2 [12-point]).

MoneyGram criticizes Judge Smith's list because none of the statutes she cited dealt with arbitration agreements. We therefore add to her list Business and Professions Code section 7191, which specifies minimum point sizes required for arbitration agreements included in residential renovation contracts.[4] In that context, "[i]f a [prescribed] provision for arbitration is included in a printed contract, it shall be set out in at least 10-point roman boldface type or in contrasting red print in at least 8-point roman boldface type, and if the provision is included in a typed contract, it shall be set out in capital letters." (Bus. & Prof. Code, § 7191, subd. (a).)

---

[4] MoneyGram claims if a California statute were to require an arbitration agreement to be in a specific size font, it would be "flatly preempted" by the FAA. Because the issue is not before us for decision, we need not comment on the merits of that argument or the fate of the California statutes we have identified as specifying a minimum point size. (Compare *Doctor's Associates, Inc. v. Casarotto* (1996) 517 U.S. 681, 684, 687–688 [holding state statute requiring arbitration clause to be in underlined capital letters on the first page of contract is preempted] with *AT&T Mobility LLC v. Concepcion, supra,* 563 U.S. at p. 347, fn. 6 ["States remain free to take steps addressing the concerns that attend contracts of adhesion—for example, requiring class-action-waiver provisions in adhesive [arbitration] agreements to be highlighted."]; see *Sanchez, supra,* 61 Cal.4th at pp. 914–915; *Hedges v. Carrigan* (2004) 117 Cal.App.4th 578, 584–585.)

In addition, as part of any contract for medical services that contains an arbitration agreement, not only is specified language defining the arbitration provision required by statute, but also the following: "Immediately before the signature line provided for the individual contracting for the medical services must appear the following in at least 10-point bold red type:

> 'NOTICE: BY SIGNING THIS CONTRACT YOU ARE AGREEING TO HAVE ANY ISSUE OF MEDICAL MALPRACTICE DECIDED BY NEUTRAL ARBITRATION AND YOU ARE GIVING UP YOUR RIGHT TO A JURY OR COURT TRIAL. SEE ARTICLE 1 OF THIS CONTRACT.' " (Code Civ. Proc., § 1295, subd. (b).)

And finally, Code of Civil Procedure section 1298 prescribes certain requirements for real estate sales contracts, including that any arbitration provision in a printed contract appear in "at least 8-point bold type or in contrasting red in at least 8-point type, and if the provision is included in a typed contract, it shall be set out in capital letters." (Code Civ. Proc., § 1298, subd. (b).) Even if violation of the typeface requirements does not invalidate the arbitration agreement (see *Hedges v. Carrigan, supra*, 117 Cal.App.4th at pp. 584–585), we nevertheless may use such legislative determinations as a reference point for the legibility of the Arbitration Provision under review and our assessment of the surprise element of unconscionability.

The foregoing statutes suggest not only that 6-point type is too small for most people to notice or read, but that the inclusion of an arbitration agreement in a noncommercial contract of adhesion is something that ought to be highlighted in readable print, bold font, and even red color if necessary to make it visible. Whether or not such minimum requirements are

enforceable (see fn. 4, *ante*), they establish certain legibility norms that MoneyGram ignored.

        d. *Illegible typeface point size:  the case law*

*Conservatorship of Link* (1984) 158 Cal.App.3d 138, 141–143, established a rule-of-thumb for release of liability clauses in contracts:  it found a release in 5.5-point type was unenforceable, in part because "[t]ypeface smaller than eight-point is an unsatisfactory reading medium." (*Id*. at p. 141.)  Other authorities agree.  "Type of 6-point or less is illegible, from the standpoint of ordinary ease of reading."  (Mellinkoff, *How to Make Contracts Illegible* (1953) 5 Stan. L.Rev. 418, 419.)  Indeed, *Link* observed that the print was "so small that one would conclude defendants never intended it to be read."  (*Link*, at p. 141.)

MoneyGram cites only two cases involving agreements with print size as small as its own that have been upheld as valid, both involving the United States Cycling Federation and a release of liability contained in its contracts with amateur bicycle racers in the 1980's.  *Bennett v. United States Cycling Federation* (1987) 193 Cal.App.3d 1485 held print size of 5.5 points in a liability release was sufficiently "conspicuous and legible" to constitute a valid release, "[s]ince the release language is practically the only language on the document."  (*Id*. at pp. 1489–1490.)  Significantly, the release language was " 'not buried in a lengthy document or hidden among other verbiage.  The type is clear and legible and in light of the fact it has no other language to compete with, its size is appropriate.' "  (*Ibid.*, quoting *Okura v. United States Cycling Federation* (1986) 186 Cal.App.3d 1462, 1468–1469.)  Moreover, there was a dispute between the parties in *Bennett* whether the print size was 5.5 points or 7 points; the court assumed it was the smaller size based on the procedural posture of the case.  (*Bennett*, at p. 1487, fn. 2.)

*Bennett* and *Okura* carry no persuasive value here for several reasons. First, as Phinney confirmed, the nominal point size does not translate perfectly from one typeface to another, so knowing only the point size does not tell us if the bicyclists' contracts were printed in a smaller physical typeface than MoneyGram's or vice versa. Second, the release language in *Bennett* and *Okura* stood out because it was alone on the page, whereas here the Arbitration Provision appears on the back of the Send Form in the midst of a block of densely compacted print. Third, if we must reach back to tiny-print contracts dating from the 1980's to find one comparable to MoneyGram's, we might conclude we are reaching (or MoneyGram is reaching) too far. Even without an expert's opinion we can say the Arbitration Provision's practically unreadable small typeface, faint contrast, thin characters, and cramped spacing reproduced on page 3, *ante*, and in appendix A are strong indicators of surprise and therefore of procedural unconscionability.

Less than two weeks after Judge Smith filed her order denying MoneyGram's petition to compel arbitration, the Supreme Court issued *OTO*, *supra*, 8 Cal.5th 111, its most recent pronouncement on adhesion contracts and unconscionability doctrine. In *OTO*, the court reviewed a car dealership's arbitration agreement contained in its employment contract, characterizing it as a "paragon of prolixity, only slightly more than a page long but written in an extremely small font." (*Id*. at p. 128.) The single opaque paragraph covering arbitration was " 'visually impenetrable' " and " 'challenge[d] the limits of legibility.' " (*Ibid*.)

The language of the MoneyGram Arbitration Provision is not prolix, and the Arbitration Provision is not as lengthy as the one in *OTO*, but the Terms and Conditions could rightly be called " 'visually impenetrable' " and

20

" 'challeng[ing] the limits of legibility.' " (*OTO*, *supra*, 8 Cal.5th at p. 128.) (See appen. A.) The parties in *OTO* argued about whether the font size was 7 points or 8.5 points. (*Id*. at p. 119, fn. 4.) In either case, the typeface was likely physically larger than the 6-point font of MoneyGram's Arbitration Provision. *OTO* concluded, "[b]y any measure, the type is quite small" (*ibid*.), and a "layperson trying to navigate this block text, printed in tiny font, would not have an easy journey" (*id*. at p. 128). The same is true here.

Last December, Division Two of this district in *Ali v. Daylight Transport, LLC* (2020) 59 Cal.App.5th 462, 474 (*Ali*) held an arbitration agreement's "small font" played a role in its being declared procedurally unconscionable. And the fact that an arbitration agreement was contained in a contract "filled from top to bottom with closely spaced lines of small type," making it "as inconspicuous as a frog in a thicket of water lilies," led the Second District, Division Six to conclude that no valid contract had been formed at all. (*Domestic Linen Supply Co., Inc. v. L J T Flowers, Inc.*, *supra*, 58 Cal.App.5th at pp. 182, 185.) The font size in *Domestic Linen* was 8 points. (*Id*. at p. 183.) Tiny font size alone weighs heavily in making MoneyGram's Arbitration Provision procedurally unconscionable.

e. *Placement*

Judge Smith also found the placement of the Arbitration Provision on the back side of the Send Form made it less conspicuous and contributed to its procedural unconscionability. In *Gutierrez*, *supra*, 114 Cal.App.4th 77, an arbitration clause was held unconscionable in part because it was "particularly inconspicuous, printed in eight-point typeface on the opposite side of the signature page of the lease." (*Id*. at p. 89.) Here, too, the words were printed on the opposite side of the signature page and in even smaller point size than that involved in *Gutierrez*.

MoneyGram points to the fact that there were references on the front of the Send Form to "attached terms and conditions," which should have alerted Fisher to the Arbitration Provision on the back side of the form.  But even if Fisher had looked on the back side, there was little about the Arbitration Provision to make it stand out from the rest of the densely packed text of the Terms and Conditions.  (See appen. A.)  The word "Arbitration" is printed in bold type, but the rest of the Arbitration Provision is not.  The entire Arbitration Provision is printed in all capital letters, but due to the small font, narrow characters, and faint typeface, it does not stand out distinctively from the surrounding text.  The court's findings that the print size was 6 points and that it was inconspicuous were factual, supported by substantial evidence.  We agree with its legal conclusion that the Arbitration Provision is procedurally unconscionable as a result.

**D. *Substantive Unconscionability***

Substantive unconscionability focuses on the actual terms of the agreement and evaluates whether they create overly harsh or one-sided results.  (*Carlson*, *supra*, 239 Cal.App.4th at p. 634.)  Several different phrases have been adopted by the courts to describe the level of imbalance in the terms required to render a contract unconscionable, but they all mean the same thing:  something more than " ' "a simple old-fashioned bad bargain," ' " involving terms that are unreasonably favorable to the more powerful party.  (*Sanchez*, *supra*, 61 Cal.4th at p. 911; *Carlson*, *supra*, 239 Cal.App.4th at p. 637, fn. 6.)

Judge Smith found MoneyGram's Arbitration Provision substantively unconscionable based on three factors viewed in the aggregate.  First, a shortened period of limitations, reduced from four years to one year; second, the provision that arbitration would be governed by the AAA's Commercial Rules, which would make the process more expensive for consumers than the

otherwise applicable AAA Consumer Rules; and finally, the provision requiring each party to "bear its own costs and fees for experts and attorneys" effectively prevented Fisher's potential recovery of attorney fees under Code of Civil Procedure section 1021.5 (Section 1021.5) in the context of Fisher's UCL claim.[5]

We agree with Judge Smith's assessment. Suffice it to say we think there is enough substantive unconscionability in each of these three clauses for them to weigh significantly in the balance against enforceability. First, the one-year statute of limitation is considerably shorter than the otherwise applicable four-year limitations period and is inherently one-sided against complaining consumers. (See *Dennison v. Rosland Capital LLC* (2020) 47 Cal.App.5th 204, 212 [one-year arbitral limitations period, compared with four years under the applicable statute of limitations, "severely shorten[ed]" the time for plaintiff to bring his claims and, together with one-sidedness of contract, supported a finding of substantive unconscionability].) Second, the hefty filing fee of $925 required by the AAA Commercial Rules—substantially more if the $800 "final fee" due in advance when the first hearing is scheduled and the fee schedule for nonmonetary claims is taken into account—serves as a deterrent to the bringing of consumer claims. (*Sanchez, supra,* 61 Cal.4th at pp. 920–921; *Gutierrez, supra,* 114 Cal.App.4th at

_____

[5] Section 1021.5 reads in pertinent part: "Upon motion, a court may award attorneys' fees to a successful party against one or more opposing parties in any action which has resulted in the enforcement of an important right affecting the public interest if: (a) a significant benefit, whether pecuniary or nonpecuniary, has been conferred on the general public or a large class of persons, (b) the necessity and financial burden of private enforcement, or of enforcement by one public entity against another public entity, are such as to make the award appropriate, and (c) such fees should not in the interest of justice be paid out of the recovery, if any."

p. 99.)[6] That is so even if, as MoneyGram claims, Fisher may have qualified for a filing fee waiver or an AAA arbitrator would likely have applied the AAA Consumer Rules, which cap the filing fee for claims at $200. When he accepted the Arbitration Provision, Fisher was not in a position to know he might qualify for treatment under the AAA Consumer Rules or that there might be some possibility of a waiver. Fisher filed a declaration in superior court that his entire income consisted of veterans' and Social Security benefits amounting to $43,034 annually, or approximately 345 percent of the federal poverty guideline for one person for 2019, when his declaration was signed.[7] Fisher's declaration does not indicate the size of his household, but he does declare that most of his income is spent on life's necessities, such as rent and food. Fisher further alleges in his declaration that it would be a hardship on him to pay the cost of an arbitration under the AAA Commercial Rules, which his attorney estimates at $14,000 to $16,000 for the arbitrator's compensation, not including attorney fees or other costs.

Even discounting his attorney's estimate of arbitrator fees, there is substantial evidence in the record that Fisher would have had trouble paying $1,725 (more than two weeks' income) to get to a hearing in arbitration on his individual restitution claim, and would have been unable to pay the $6,250 required to initiate arbitration of his nonmonetary and unwaivable claim for a public injunction (see *McGill v. Citibank, N.A.* (2017) 2 Cal.5th 945, 962 [right to seek public injunction under UCL is unwaivable]), and that figure

---

[6] According to our reading of the AAA Commercial Rules, the initial filing fee for a commercial claim for less than $75,000 is $925, with another $800 "final fee" due in advance when the first hearing is scheduled. For a nonmonetary claim, such as the injunctive and declaratory relief requested in this case, the initial filing fee is $3,500, with a final fee, due at scheduling of the first hearing, of $2,750 (or a total of $6,250 just to secure a hearing).

[7] The federal poverty guideline for one person in 2019 was $12,490.

does not include arbitrator compensation, expenses or attorney fees. His filing fee in court was $1,435. We conclude Fisher qualified under *Gutierrez* and *Sanchez* to assert a claim of unconscionability based on unaffordable AAA commercial fees in that he showed he could not pay the commercial fees or they had a "substantial deterrent effect" on filing his UCL claim in arbitration. (*Sanchez, supra*, 61 Cal.4th at p. 920.)

Third, we agree with Fisher that, on this record—which involves a UCL claim asserted on a class-wide basis on behalf of retail consumers exposed to fraud by a company that, so it is alleged, has failed to comply with an FTC injunction designed to protect against that very fraud—the provision requiring each party to "bear its own costs and fees for experts and attorneys" amounts to a waiver of Fisher's potential right to an award of attorney fees under Section 1021.5 and therefore is another factor making the Arbitration Provision unduly harsh. In effect, the prospect that the kind of fee and cost award that might serve as a substantial incentive to the bringing of this kind of claim has either been eliminated or cast into doubt, thereby undermining the incentivizing effect Section 1021.5 is designed to have.

MoneyGram contends that the provision requiring each party to bear its own fees and costs is nothing more than a contractual codification of the American Rule governing attorney fee recovery (see Code Civ. Proc., § 1021) and that, in any event, the clause does not, in fact, prohibit Fisher from recovering attorney fees in arbitration. MoneyGram again turns to the AAA rules to rescue it from its own drafting, claiming that the fees provision, regardless of its express terms, would not be enforced by the AAA. The AAA rules, both commercial and consumer, authorize an arbitrator to award attorney fees to a party so entitled under the law. (AAA Commercial Arbitration Rules, rule R-47(d)(ii); AAA Consumer Arbitration Rules, rule

25

R-44(a).) MoneyGram contends the AAA rules would supersede its own fees provision and would allow Fisher to recover private attorney general fees under Section 1021.5 in arbitration. Once again, we conclude MoneyGram cannot depend on the AAA's more reasonable policies to eradicate the substantive unconscionability of the attorney fees provision. Perhaps in application this provision *may* be given the interpretation MoneyGram places upon it, but consumers have no way to know that up front and must simply take the risk the AAA rules would override MoneyGram's fees provision as drafted. Thus, we still see a degree of substantive unconscionability from the standpoint of what a consumer signing the clause would be in a position to know at the moment of contracting. (*Gutierrez*, *supra*, 114 Cal.App.4th at p. 91; Civ. Code, § 1670.5.) It is also notable that, so far as the record discloses, Fisher was not given a copy of the AAA Commercial Rules. (See *Ali*, *supra*, 59 Cal.App.5th at pp. 475–476.)

Standing alone, the degree of substantive unconscionability flowing from each of these three issues is modest. But collectively, their impact is substantial. Accordingly, we conclude that the AAA Commercial Rules provision in MoneyGram's Arbitration Provision produces an unacceptable deterrent effect on the exercise of Fisher's right to pursue a statutory remedy.

### E. *Using a Sliding Scale, the Entire Arbitration Provision Is Unconscionable as a Matter of Law*

As noted above, unconscionability works on a sliding scale: the greater the procedural unconscionability, the less substantive unconscionability is required to make the contract unenforceable, and vice versa. (*Armendariz*, *supra*, 24 Cal.4th at p. 114; *Carlson*, *supra*, 239 Cal.App.4th at p. 630.) We conclude the procedural unconscionability was extremely high in this case and the substantive provisions also contributed significantly to the

26

unconscionability, thereby making the entire Arbitration Provision unenforceable.

In *OTO*, *supra*, 8 Cal.5th 111, the Supreme Court held an arbitration agreement bore an " 'extraordinarily high' " degree of procedural unconscionability where its font size was either 7 points or 8.5 points. (*Id*. at pp. 119, fn. 4, 126.) Here, the font was 6 points, justifying an extreme assessment of procedural unconscionability. We see no reason why MoneyGram's tiny-font Arbitration Provision should not be considered procedurally unconscionable as a matter of law, and to a high degree of unconscionability, based both on surprise and oppression. If a consumer cannot find or read an arbitration agreement, he or she may easily fall prey to greater substantive unfairness than would otherwise inhere even in a typical adhesion contract.

Because we consider the procedural unconscionability of MoneyGram's Arbitration Provision to be extremely high, even a "relatively low" degree of substantive unconscionability is sufficient to render it unenforceable. (*OTO*, *supra*, 8 Cal.5th at p. 130.) The Arbitration Provision here, with its terms considered in the aggregate, easily crosses that threshold.

## F. *Refusal To Sever the Unconscionable Provisions Was Not an Abuse of Discretion*

Finally, MoneyGram asks us to sever any unconscionable provisions of the Arbitration Provision but to enforce the balance. This form of remedy is expressly provided in Civil Code section 1670.5. On the issue of severance, we review the superior court's decision only for abuse of discretion. (*Armendariz*, *supra*, 24 Cal.4th at pp. 122, 124; *Baxter v. Genworth North America Corp.* (2017) 16 Cal.App.5th 713, 722.)

Judge Smith explained her refusal to sever: "The court could not sever these three provisions because to do so would make material changes in the

27

agreement as a whole." It is generally considered grounds for denying severance if the Arbitration Provision is " 'permeated' " with unconscionability. (*Armendariz, supra*, 24 Cal.4th at pp. 124–125; *Baxter v. Genworth North America Corp.*, *supra*, 16 Cal.App.5th at pp. 720, 737–738.)

"Two reasons for severing or restricting [unconscionable] terms rather than voiding the entire contract appear implicit in case law. The first is to prevent parties from gaining undeserved benefit or suffering undeserved detriment as a result of voiding the entire agreement—particularly when there has been full or partial performance of the contract. [Citations.] Second, more generally, the doctrine of severance attempts to conserve a contractual relationship if to do so would not be condoning an illegal scheme. [Citations.] The overarching inquiry is whether ' "the interests of justice . . . would be furthered" ' by severance." (*Armendariz, supra*, 24 Cal.4th at pp. 123–124.) Correspondingly, the courts have identified three reasons for denying severance of unconscionable terms. " 'First, "[i]f the central purpose of the contract is tainted with illegality, then the contract as a whole cannot be enforced." (*Armendariz, supra*, 24 Cal.4th at p. 124.) Second, the fact that an "arbitration agreement contains more than one unlawful provision" may "indicate a systematic effort to impose arbitration on [a consumer] . . . as an inferior forum that works to the [business's] advantage" and may justify a conclusion "that the arbitration agreement is permeated by an unlawful purpose." (*Ibid*.) Third, if "there is no single provision a court can strike or restrict in order to remove the unconscionable taint from the agreement," the court would have to "reform the contract, not through severance or restriction, but by augmenting it with additional terms," which would exceed its power to cure a contract's illegality.' " (*Ali, supra*, 59 Cal.App.5th at p. 481.)

The foregoing reasons do not call for severance in this case, as it would not serve the ends of justice. The Arbitration Provision contains three clauses contributing to its substantive unconscionability. There is no single provision we could strike to eliminate its unconscionable taint. To the extent MoneyGram suffers "detriment" by the remedy we provide Fisher, it is not "undeserved." (See *Armendariz, supra*, 24 Cal.4th at p. 123.) MoneyGram's Arbitration Provision shows every sign of having been designed to take unfair advantage of its customers. MoneyGram is now willing to have the Arbitration Provision enforced as significantly modified to avoid substantive unconscionability. We would not presume to impose such a thoroughly different bargain on the parties based on the fallacious notion that the superior court had abused its discretion or that refusing to enforce the Arbitration Provision would somehow be unfair to MoneyGram. (See *Martinez v. Master Protection Corp.* (2004) 118 Cal.App.4th 107, 116–117; see also *Armendariz, supra*, 24 Cal.4th at p. 125 [a party cannot " 'resuscitate a legally defective contract merely by offering to change it' "]; *Carlson, supra*, 239 Cal.App.4th at pp. 636–637; *O'Hare v. Municipal Resource Consultants* (2003) 107 Cal.App.4th 267, 280 [willingness to accept severance " ' "can be seen, at most, as an offer to modify the contract; an offer that was never accepted." ' "].) We find no abuse of discretion in the superior court's decision to deny severance and to declare the entire Arbitration Provision unenforceable.

## III. DISPOSITION

The superior court's order of August 16, 2019, denying MoneyGram's petition to compel arbitration is affirmed.  Fisher's request for judicial notice is granted as unopposed.  Fisher's motion for new evidence is denied.  Fisher is awarded costs on appeal.

STREETER, Acting P. J.

WE CONCUR:

TUCHER, J.
BROWN, J.

30

## MONEYGRAM® TERMS AND CONDITIONS

MoneyGram® money transfer services ("Services") are provided by MoneyGram Payment Systems, Inc. ("we", "us" or "MoneyGram") a licensed money transmitter, through its network of agents, authorized delegates and other permitted entities ("Agents") and are subject to these Terms and Conditions and applicable law. Additional information regarding the Services may be available and obtained online at www.moneygram.com or by asking an Agent. These Terms and Conditions, along with any forms, receipts, acknowledgments, or other documentation completed or used in connection with your use of the Services, including any pre-transaction or post-transaction disclosures, constitute the entire agreement ("Agreement") between you, the individual purchaser of the Services ("you" or "Sender") and MoneyGram. The Services, the underlying money transfer ("Transfer") and certain aspects of the Services and Transfer (including, but not limited to, Agent hours, Agent access, currencies held by an Agent, and the amount of a Transfer ("Transfer Amount")), may, as applicable, be delayed, restricted, forfeited, or ultimately unavailable due to certain laws and regulations governing our Services as well as certain circumstances and conditions associated with your use of the Services. We will report the Transfer and Transfer Amount, and other information relating to you and/or the use of the Services, to the appropriate legal or regulatory authorities, governing bodies or entities when necessary or appropriate pursuant to the laws and regulations governing our Services.

Receive Information. The individual designated by you to receive the Transfer ("Receiver") may receive the funds sent by you at our Agents in Expected Destinations. As used herein, an "Expected Destination" generally means, for money transfer transactions from the United States that are to be received within the United States ("Domestic Transfers"), the State designated by you where the Receiver is to receive the Transfer within the United States or a State contiguous to such designated State; and for money transfer transactions sent from the United States that are to be received outside of the United States ("International Transfers"), the country or territory, as applicable, designated by you where the Receiver is to receive the Transfer. Depending on the type of Service selected by you, the disbursement of the Transfer will generally occur in the form of cash, money order, check, account deposit, or a combination of these payout methods ("Payout Methods"). Under certain circumstances, the Receiver may request a Payout Method that differs from the Payout Method you have selected and you authorize MoneyGram to honor the Receiver's election. A Transfer is deemed disbursed by us and delivered, and we have no further liability to you, except as set forth below, when it is actually disbursed by our Agent (or notice of the Transfer's disbursement is made available to us by the bank or account provider holding the account or their designee) to the Receiver, subject to the Receiver Identification provisions herein. Status tracking of a Transfer to an account may not be available from us. Certain Expected Destinations may impose taxes, fees, and or tariffs upon the Receiver's receipt of, or access to, the Transfer. All fees charged by us as part of the Transfer ("Transfer Fees" or "Consumer Fees"), all taxes collected by us and charged to you as part of the Transfer ("Transfer Taxes") and all applicable third party fees that are required to be disclosed to you ("Other Fees") shall each be as identified on the applicable pre-transaction and post-transaction disclosures generated with your Transfer. Transactions which (i) exceed certain amounts; (ii) are to certain Expected Destinations; (iii) implicate any legal, compliance or other regulatory issues; or (iv) are sent through delayed delivery options may take longer than anticipated for delivery, may be subject to do lar limits or may be subject to additional restrictions and may affect the ability for the Transfer to be disbursed. At no time will either you or the Receiver have a deposit with MoneyGram.

Expired Transfers. The following provision only applies to transfers in the US and Commonwealth of Puerto Rico: If you ask us to make a Transfer to be collected in cash and the Transfer amount has not been collected within 90 days, we will treat the Transfer as no longer capable of execution (an "Expired Transfer"). We will have no obligation, after that 90 day period, to execute an Expired Transfer. If an Expired Transfer occurs, you will be entitled to a refund of the amount of the Expired Transfer. If you become aware that a transferred amount has not been collected please contact us to ask for a refund.

Refund Information. Subject to applicable law, (i) your Transfer may be cancelled for a refund of the Transfer Amount, unless the Transfer has been disbursed or deposited by us at the time we received your cancellation request and (ii) except as described below, the Transfer Fees associated with your Transfer are usually not refundable. You may request a refund and cancellation of the Transfer either by visiting an Agent location or contacting MoneyGram. All refund requests for Domestic Transfers will be subject to MoneyGram's review and discretion and will normally be processed within thirty (30) days of receipt of a valid written request unless a shorter period is required by law. Effective October 28, 2013 (i) International Transfers may be cancelled for a full refund of the Transfer Amount and all Transfer Fees or Transfer Taxes paid by you within thirty (30) minutes after you have made the payment for the Transfer, unless such International Transfer has already been disbursed by us at the time of such oral or written cancellation request and (ii) you may be entitled to a full refund of the Transfer Amount and all Transfer Fees or Transfer Taxes paid by you if an error has occurred as set forth above or as otherwise provided under applicable law. Your rights regarding the Transfer are further explained under the applicable disclosures generated in connection with such International Transfer.

Reference Numbers; Identification. You will receive a reference number that corresponds to your Transfer ("Reference Number") and your designated Receiver may be required to provide such Reference Number to receive the Transfer. We reserve the right to require, and may be legally required to obtain, documentation that will identify you and/or your designated Receiver in connection with any purchase and/or use of our Services ("ID"). MoneyGram's obligations to you shall cease once the Transfer is disbursed to an individual who provides governmental issued ID and the correct Reference Number.

Exchange Rate; Currency Availability. In addition to the Transfer Fees applicable to your Transfer, if the Transfer is an International Transfer, a currency exchange rate may be applied. United States currency is converted to a foreign currency at an exchange rate set by us ("Exchange Rate"). The Exchange Rate described on any pre-transaction and post-transaction disclosures provided by MoneyGram to you has been rounded to the number of decimal places identified on such disclosures. The number of decimal places used by MoneyGram to convert the currency into foreign currency may be greater than that displayed on the disclosures. Any difference in the Exchange Rate disclosed to you in writing and the exchange rate received by MoneyGram will be kept by MoneyGram (and/ or its Agents in some cases). Payouts will generally be made in the national currency of the Expected Destination ("Local Currency"). In some countries or territories you may designate a payout currency other than the Local Currency. The payout currency, whether expressed in the Local Currency or otherwise, shall be reflected in the pre-transaction and post-transaction disclosures. Because not all currencies are available in all Agent locations, please ask an Agent or contact us by visiting www.moneygram.com or calling 1-800-926-9400 for information regarding the currency Exchange Rate or the currencies available in the Expected Destination.

LIABILITY. UNLESS APPLICABLE LAW REQUIRES OTHERWISE, YOUR EXCLUSIVE AND MAXIMUM REMEDY AGAINST MONEYGRAM IS REFUND OF THE TRANSFER AMOUNT PLUS ANY TRANSFER FEES CHARGED BY MONEYGRAM. NO OTHER REMEDY IS AVAILABLE TO YOU, INCLUDING, BUT NOT LIMITED TO ANY REMEDY FOR INCIDENTAL, INDIRECT, SPECIAL OR CONSEQUENTIAL DAMAGES. THESE LIMITATIONS APPLY WHETHER YOUR CLAIM ARISES DUE TO MONEYGRAM'S OR ITS AGENTS' NEGLIGENCE, OTHER FAULT, ERROR, OMISSION OR NON-PERFORMANCE. WE ACCEPT NO RESPONSIBILITY FOR THE ACTS OR OMISSIONS OF A RECEIVER'S BANK, SERVICE PROVIDER OR THEIR DESIGNEES.

ARBITRATION. UNLESS OTHERWISE SPECIFIED BY APPLICABLE LAW, ANY CONTROVERSY OR CLAIM ARISING OUT OF OR RELATING TO THE TRANSFER, THE AGREEMENT OR BREACH OF THIS AGREEMENT, INCLUDING STATUTORY CONSUMER CLAIMS, SHALL BE SETTLED BY ARBITRATION ADMINISTERED BY THE AMERICAN ARBITRATION ASSOCIATION ("AAA") UNDER ITS COMMERCIAL ARBITRATION RULES. JUDGMENT ON THE ARBITRATION AWARD MAY BE ENTERED IN ANY COURT HAVING JURISDICTION THEREOF. ANY SUCH ARBITRATION SHALL BE INITIATED AND HELD IN THE OFFICE OF THE AAA CLOSEST TO THE AGENT LOCATION WHERE YOU INITIATED THE TRANSFER. EACH PARTY SHALL BEAR ITS OWN COSTS AND FEES FOR EXPERTS AND ATTORNEYS, AND NO PARTY SHALL HAVE A RIGHT TO PARTICIPATE AS A MEMBER OF ANY CLASS OF CLAIMANTS. THIS EXCLUSIVE ARBITRATION REMEDY SHALL NOT BE AVAILABLE UNLESS INITIATED WITHIN ONE YEAR AFTER THE CONTROVERSY OR CLAIM AROSE.

General. This Agreement is governed by Minnesota law without regard to its conflicts of law rules, supersedes all prior agreements or understandings between you and MoneyGram, and cannot be modified orally. In the event of any conflict between the English version of our Agreement with you and any non-English version, the English version shall control and govern. Services are directed to persons 18 years and over, may not be used for escrow purposes or gambling, and may only be used for a lawful purpose. You represent, warrant and acknowledge to MoneyGram that (i) all information you supply to us as part of this Agreement is truthful, accurate and complete, (ii) you have received and reviewed a pre-transaction disclosure and/or receipt in connection with your purchase of Services and that the information contained on such documentation is complete and accurate and (iii) your use of the Services does not violate any law, including without limitation, laws relating to money laundering, illegal gambling activities, support for terrorist activities or fraud. You shall indemnify MoneyGram and its Agents for all losses of any kind (including attorneys fees) arising out of any breach of the Agreement by you or by the Receiver. MoneyGram may refuse to provide Services to any person.

Privacy Notice. MoneyGram may disclose your personal information to third parties as outlined in the MoneyGram Privacy Statement, which is available on our website at www.moneygram.com or by calling 1-800-926-9400. Disclosed information may include, but is not limited to, your contact information, your identification, information about the Transfer or your use of the Services, or other information relating to financial matters. The information may be disclosed to financial institutions, our Agents, our service providers, or governmental or other regulatory agencies (including law enforcement officials within or outside of the United States), and direct marketers. To opt out of receiving information about our products and services, email marketingpreferences@moneygram.com or call 1-800-926-9400. To help protect your personal information, we endeavor to use reasonable security measures.

## MONEYGRAM® TÉRMINOS Y CONDICIONES

Los servicios de transferencia de dinero de MoneyGram® ("Servicios") son proporcionados por MoneyGram Payment Systems, Inc. ("nosotros", "nos" o "MoneyGram") a través de su red de agentes, delegados autorizados y otras entidades permitidas ("Agentes"), y están sujetos a estos Términos y condiciones, y a la ley aplicable. Para obtener información adicional acerca de los Servicios, puede visitar el sitio web en www.moneygram.com o consultar a un Agente. Estos Términos y condiciones, junto con cualesquiera formularios, recibos, acuses de recibo u otra documentación completada o utilizada en relación con el uso que usted haga de los Servicios, lo que incluye cualquier documentación previa o posterior a una transacción, constituyen el acuerdo completo ("Acuerdo") entre usted, el comprador particular de los Servicios ("usted" o "Remitente") y MoneyGram. Es posible que los Servicios, la transferencia de dinero subyacente ("Transferencia") y ciertos aspectos de los Servicios y la Transferencia (lo que incluye, entre otros, el horario del Agente, el acceso al Agente, las monedas con que opera el Agente y el Monto de transferencia ("Monto de transferencia")), sufran demoras o restricciones, se pierdan o en última instancia no estén disponibles, según corresponda, debido a ciertas leyes y reglamentaciones que rigen nuestros Servicios, y a determinadas circunstancias y condiciones relacionadas con el uso que usted haga de dichos Servicios. Cuando sea necesario o cuando corresponda en virtud de las leyes y reglamentaciones que rigen nuestros Servicios, informaremos la Transferencia y el Monto de transferencia, además de otra información relacionada con usted y/o con el uso de los Servicios, a las autoridades legales o reguladoras, o a las entidades u organismos rectores correspondientes.

Información de recepción. La persona que usted designe para recibir la Transferencia ("Destinatario") podrá recibir los fondos que usted envíe a través de nuestros Agentes en los Destinos esperados. Tal como se utiliza en el presente, un "Destino esperado" generalmente significa, para transacciones de transferencias de dinero que se originan en los Estados Unidos y reciben dentro de los Estados Unidos ("Transferencias nacionales"), el Estado designado por usted para que el Destinatario reciba la Transferencia dentro de los Estados Unidos o un Estado contiguo al Estado designado; y para transacciones de transferencias de dinero que se originan en los Estados Unidos pero que se reciben fuera de dicho país ("Transferencias internacionales"), el país o territorio, según corresponda, designado por usted para que el Destinatario reciba la transferencia. Según el tipo de Servicio que seleccione, el desembolso de la Transferencia, por lo general, se realizará mediante dinero en efectivo, giro, cheque, depósito en cuenta o una combinación de estos métodos de pago ("Métodos de pago"). Bajo ciertas circunstancias, el Destinatario podrá solicitar un Método de pago diferente al que usted haya seleccionado, y usted autoriza a MoneyGram a aceptar la elección del Destinatario. Se considera que una Transferencia es desembolsada y entregada por nosotros y que no tenemos más obligaciones para con usted, a excepción de lo establecido más abajo, cuando nuestro Agente realiza el desembolso al Destinatario (o recibimos notificación del desembolso de la Transferencia a través del banco o proveedor que mantiene la cuenta, o de la persona que estos designen), sujeto a las disposiciones sobre identificación del Destinatario que se incluyen en el presente. Es posible que no le brindemos el servicio de seguimiento del estado de una Transferencia a una cuenta. Ciertos Destinos esperados pueden gravar con impuestos, tasas o aranceles el recibo de la Transferencia o el acceso a esta por parte del Destinatario. Todas las tarifas cobradas por nosotros como parte de la Transferencia ("Tarifas de la Transferencia" o "Tarifas para el consumidor"), todos los impuestos recaudados por nosotros y cobrados a usted como parte de la Transferencia ("Impuestos por Transferencia") y todas las demás tarifas aplicables de terceros que deban ser informadas a usted ("Otras tarifas") serán identificadas individualmente en los documentos correspondientes antes y después de la transacción que se generen con su Transferencia. Las transacciones que (i) superen determinados montos; (ii) estén dirigidas a ciertos Destinos esperados; (iii) impliquen cuestiones legales, de cumplimiento u otras cuestiones regulatorias; o (iv) se envíen a través de opciones de entrega demorada pueden tomar más tiempo que el previsto para la entrega, o estar sujetas a límites de dinero o a restricciones adicionales, y afectar la capacidad para que la Transferencia sea desembolsada. Ni usted ni el Destinatario tendrán un depósito en MoneyGram en ningún momento.

Transferencias Vencidas La disposición siguiente se aplica únicamente a las transferencias en los EE. UU. y el Estado Libre Asociado de Puerto Rico: Si nos solicita que llevemos a cabo una transferencia para ser retirada en efectivo y el monto de la Transferencia no se cobró en 90 días, trataremos la transferencia como que ya no puede ejecutarse ("Transferencia vencida"). No tendremos obligación, después de ese plazo de 90 días, de ejecutar una Transferencia vencida. Si ocurre una transferencia vencida, tendrá derecho a un reembolso del monto de la Transferencia vencida. Si obtiene conocimiento de que un monto transferido no se cobró, comuníquese con nosotros para solicitar su reembolso.

Información de reembolso. Sujeto a la ley aplicable, (i) su Transferencia podrá ser cancelada para obtener un reembolso del Monto de transferencia, a menos que hayamos desembolsado o depositado dicha Transferencia al momento en que recibimos su solicitud de cancelación, y (ii) a excepción de lo descrito más abajo, las Tarifas de la Transferencia en cuestión, por lo general, no son reembolsables. Para solicitar el reembolso y cancelación de la Transferencia, puede visitar una localidad de Agente o comunicarse con MoneyGram. Todas las solicitudes de reembolso para transferencias nacionales estarán sujetas a la revisión y discreción de MoneyGram y, por lo general, se procesarán dentro de los 30 días de recibir una solicitud válida por escrito, a no ser que por ley se requiera su procesamiento en un período más breve. Con vigencia a partir del 28 de octubre de 2013, (i) las transferencias internacionales se podrán cancelar para obtener el reembolso total del Monto de transferencia y se le devolverán todas las tarifas de la Transferencia o Impuestos por Transferencia pagados por usted, dentro de los treinta (30) minutos luego de haber efectuado el pago de la Transferencia, a menos que dicha Transferencia internacional ya haya sido desembolsada al momento en que se solicita la cancelación de forma oral o escrita; y (ii) usted podrá tener derecho al reembolso total del Monto de transferencia y a todas las Tarifas de la Transferencia o Impuestos por Transferencia pagados por usted se si ha producido un error según se establece anteriormente o en virtud de lo estipulado por la ley aplicable. Sus derechos en torno a la Transferencia se explican con más detalle en la documentación correspondiente generada en relación con la Transferencia internacional.

Identificación, preguntas de prueba y números de referencia. Nosotros nos reservamos el derecho a exigir, y podemos estar obligados legalmente a solicitar, documentación que lo identifique a usted y/o al Destinatario en relación con cualquier compra y/o uso de nuestros Servicios ("Identificación"). En algunas localidades de Agente, también se podrá exigir al Destinatario que responda a una pregunta de prueba, en lugar de suministrar su identificación, para recibir la Transferencia. Es posible que las preguntas de prueba no estén disponibles en ciertas localidades de Agente o Destinos esperados. Si bien usted recibirá un número de referencia correspondiente a su Transferencia ("Número de referencia"), dicho número no siempre será necesario para recibir una Transferencia cuando se utilicen otros medios de identificación (tales como recibo de Identificación o preguntas de prueba). MoneyGram no tendrá ninguna responsabilidad en el caso de que la Transferencia sea desembolsada, cuando corresponda, a una persona que responda correctamente a la pregunta de prueba, suministre una

Tipo de cambio; disponibilidad de monedas. Además de las Tarifas de la Transferencia aplicables a su operación, si la Transferencia es una Transferencia internacional, podrá aplicarse un tipo de cambio a la moneda. La moneda estadounidense se convierte a monedas extranjeras, utilizando un tipo de cambio establecido por nosotros ("Tipo de cambio"). El Tipo de cambio descrito en cualquier documentación previa o posterior a la transacción suministrada por MoneyGram se ha redondeado a la cantidad de decimales que se indica en dicha documentación. La cantidad de decimales utilizados por MoneyGram para convertir la moneda a moneda extranjera puede ser mayor que la que se indica en la documentación. Cualquier diferencia entre el Tipo de cambio que se le informe a usted por escrito y el tipo de cambio recibido por MoneyGram será conservada por MoneyGram (y/o sus Agentes en algunos casos). Por lo general, los pagos se realizarán en la moneda nacional del Destino esperado ("Moneda local"). En algunos países o territorios, usted puede designar una moneda de pago diferente a la Moneda local. La moneda de pago, expresada en Moneda local o en otra moneda, se reflejará en la documentación previa y posterior a la transacción. Dado que no todas las localidades de Agente tienen disponibilidad de todas las monedas, consulte al Agente o comuníquese con nosotros visitando www.moneygram.com o llamando al 1-800-926-9400, para obtener información sobre el Tipo de cambio de la moneda o monedas disponibles en el Destino esperado.

RESPONSABILIDAD CIVIL. A MENOS QUE LA LEY APLICABLE EXIJA LO CONTRARIO, SU ÚNICO Y MÁXIMO RECURSO EN CONTRA DE MONEYGRAM ES EL REEMBOLSO DEL MONTO DE LA TRANSFERENCIA MÁS CUALESQUIERA TARIFAS DE LA TRANSFERENCIA COBRADOS POR MONEYGRAM. NO EXISTE NINGÚN OTRO RECURSO DISPONIBLE, ENTRE OTROS, RECURSOS POR DAÑOS INCIDENTALES, INDIRECTOS, ESPECIALES O SOBREVINIENTES. ESTAS LIMITACIONES SE APLICAN INDEPENDIENTEMENTE DE QUE SU RECLAMO SURJA DEBIDO A NEGLIGENCIA, OTRO TIPO DE FALLA, ERROR, OMISIÓN O INCUMPLIMIENTO DE MONEYGRAM O SUS AGENTES. NO ACEPTAMOS RESPONSABILIDAD ALGUNA POR LOS ACTOS U OMISIONES DEL BANCO DEL DESTINATARIO, DEL PROVEEDOR DE SERVICIOS O DE LAS PERSONAS DESIGNADAS POR ESTOS.

ARBITRAJE. SALVO QUE LA LEY APLICABLE INDIQUE LO CONTRARIO, CUALQUIER CONTROVERSIA O RECLAMO QUE SURJA DE LA TRANSFERENCIA O EN RELACIÓN CON ELLA, O DE ESTE ACUERDO O SU INCUMPLIMIENTO, INCLUIDOS LOS RECLAMOS LEGALES DEL CONSUMIDOR, SERÁN RESUELTOS MEDIANTE ARBITRAJE CONDUCIDO POR LA ASOCIACIÓN ESTADOUNIDENSE DE ARBITRAJE (AMERICAN ARBITRATION ASSOCIATION, "AAA") EN CUMPLIMIENTO DE LAS REGLAS DE ARBITRAJE COMERCIAL. PUEDE DICTARSE SENTENCIA SOBRE EL LAUDO DE ARBITRAJE EN CUALQUIER TRIBUNAL COMPETENTE. TODO ARBITRAJE SE INICIARÁ Y CELEBRARÁ EN LA OFICINA DE LA AAA MÁS CERCANA A LA LOCALIDAD DE AGENTE DONDE SE INICIÓ LA TRANSFERENCIA. CADA PARTE ASUMIRÁ SUS PROPIOS COSTOS Y HONORARIOS POR LA CONTRATACIÓN DE ESPECIALISTAS Y ABOGADOS, Y NINGUNA DE LAS PARTES TENDRÁ DERECHO A PARTICIPAR COMO MIEMBRO DE NINGUNA CLASE DE DEMANDANTES. ESTE RECURSO DE ARBITRAJE EXCLUSIVO NO PROCEDERÁ A MENOS QUE SE INICIE DENTRO DEL AÑO SIGUIENTE A LA FECHA EN QUE SURGE LA CONTROVERSIA O EL RECLAMO.

Consideraciones generales. Este Acuerdo se rige por la legislación de Minnesota, independientemente de los conflictos de los principios de la legislación, reemplaza todos los acuerdos o convenios anteriores entre usted y MoneyGram, y no puede modificarse oralmente. En el caso de que surjan conflictos entre la versión en inglés de nuestro Acuerdo con usted y cualquier versión en otro idioma diferente, regirá la versión en inglés. Los servicios están dirigidos a personas que tienen 18 años de edad en adelante, no pueden utilizarse para realizar apuestas o con fines de fideicomiso y solo pueden utilizarse con fines legales. Usted declara, garantiza y reconoce ante MoneyGram que (i) toda la información que nos provee como parte de este Acuerdo es verdadera, exacta y completa, (ii) ha recibido y revisado la documentación previa a la transacción y/o un recibo en relación con su compra de Servicios y que la información incluida en dicha documentación es completa y exacta, y (iii) el uso que usted hace de los Servicios no infringe legislación alguna, incluidas entre otras, las leyes relacionadas con el lavado de dinero, las actividades de apuestas ilegales, la financiación de actividades terroristas o el fraude. Usted deberá indemnizar a MoneyGram y a sus Agentes por las pérdidas de cualquier tipo (incluidos los honorarios de abogados) que surjan por cualquier incumplimiento del Acuerdo por parte de usted o del Destinatario. MoneyGram puede rehusarse a brindar los Servicios a cualquier persona.

Notificación de Confidencialidad. MoneyGram puede revelar su información personal a terceros como está indicado en la Declaración de Privacidad de MoneyGram, la cual está disponible en nuestro sitio web en www.moneygram.com o llamando al 1-800-926-9400. Información divulgada puede incluir, pero no se limita a, su información de contacto, su identificación, información sobre la Transferencia o su uso de los Servicios o cualquier otra información relacionada con las cuestiones financieras. La información puede ser revelada a las instituciones financieros, nuestros proveedores de servicios o agencias reguladoras gubernamentales o de otro tipo (en particular los funcionarios encargados de hacer cumplir la ley dentro o fuera de los Estados Unidos), y los vendedores directos. Para dejar de recibir información sobre nuestros productos y servicios, envíé un correo electrónico a marketingpreferences@moneygram.com o llame 1-800-926-9400. Para ayudar a proteger su información personal, nos esforzamos a utilizar medidas de seguridad razonables.

For Walmart2Walmart powered by Ria transactions, terms and conditions will be available on your receipt. You can also refer to terms and conditions online at www.riafinancial.com. Para transacciones Walmart2Walmart efectuadas a través de Ria, los términos y condiciones están disponibles en el recibo. También puede consultar los GNFR 100617218

D86 FY19 Q1 W2 World Money Services Campaign | Transfer Form | ©2018 Walmart Apollo, LLC ❖SSB



GNFR 100617218

## APPENDIX A

Walmart2Walmart Terms and Conditions are available on the receipt

MoneyGram® money transfer services ("Services") are provided by MoneyGram Payment Systems, Inc. ("we", "us" or "MoneyGram") through its network of agents, authorized delegates and other permitted entities ("Agents") and are subject to these Terms and Conditions and applicable law. Additional information regarding the Services may be available and obtained online at www.moneygram.com or by asking an Agent. These Terms and Conditions, along with any forms, receipts, acknowledgments, or other documentation completed or used in connection with your use of the Services, including any pre-transaction or post-transaction disclosures, constitute the entire agreement ("Agreement") between you, the individual purchaser of the Services ("you" or "Sender") and MoneyGram. The Services, the underlying money transfer ("Transfer") and certain aspects of the Services and Transfer (including, but not limited to, Agent hours, Agent access, currencies held by an Agent, and the amount of a Transfer ("Transfer Amount")), may, as applicable, be delayed, restricted, forfeited, or ultimately unavailable due to certain laws and regulations governing our Services as well as certain circumstances and conditions associated with your use of the Services. We will report the Transfer and Transfer Amount, and other information relating to you and/or the use of the Services, to the appropriate legal or regulatory authorities, governing bodies or entities when necessary or appropriate pursuant to the laws and regulations governing our Services.

**Receive Information.** The individual designated by you to receive the Transfer ("Receiver") may receive the funds sent by you at our Agents in Expected Destinations. As used herein, an "Expected Destination" generally means, for money transfer transactions from the United States that are to be received within the United States ("Domestic Transfers"), the State designated by you where the Receiver is to receive the Transfer within the United States or a State contiguous to such designated State; and for money transfer transactions sent from the United States that are to be received outside of the United States ("International Transfers"), the country or territory, as applicable, designated by you where the Receiver is to receive the Transfer. Depending on the type of Service selected by you, the disbursement of the Transfer will generally occur in the form of cash, money order, check, account deposit, or a combination of these payout methods ("Payout Methods"). Under certain circumstances, the Receiver may request a Payout Method that differs from the Payout Method you have selected and you authorize MoneyGram to honor the Receiver's election. A Transfer is deemed disbursed by us and delivered, and we have no further liability to you, except as set forth below, when it is actually disbursed by our Agent (or notice of the Transfer's disbursement is made available to us by the bank or account provider holding the account or their designee) to the Receiver, subject to the Receiver identification provisions herein. Status tracking of a Transfer to an account may not be available from us. Certain Expected Destinations may impose taxes, fees, and/or tariffs upon the Receiver's receipt of, or access to, the Transfer. All fees charged by us as part of the Transfer ("Transfer Fees" or "Consumer Fees"), all taxes collected by us and charged to you as part of the Transfer ("Transfer Taxes") and all applicable third party fees that are required to be disclosed to you ("Other Fees") shall each be as identified on the applicable pre-transaction and post-transaction disclosures generated with your Transfer. Transactions which (i) exceed certain amounts; (ii) are to certain Expected Destinations; (iii) implicate any legal, compliance or other regulatory issues; or (iv) are sent through delayed delivery options may take longer than anticipated for delivery, may be subject to dollar limits or may be subject to additional restrictions and may affect the ability for the Transfer to be disbursed. At no time will either you or the Receiver have a deposit with MoneyGram.

**Refund Information.** Subject to applicable law, (i) your Transfer may be cancelled for a refund of the Transfer Amount, unless the Transfer has been disbursed or deposited by us at the time we received your cancellation request and (ii) except as described below, the Transfer Fees associated with your Transfer are usually not refundable. You may request a refund and cancellation of the Transfer either by visiting an Agent location or contacting MoneyGram. All refund requests for Domestic Transfers will be subject to MoneyGram's review and discretion and will normally be processed within thirty (30) days of receipt of a valid written request unless a shorter period is required by law. Effective October 28, 2013 (i) International Transfers may be cancelled for a full refund of the Transfer Amount and all Transfer Fees or Transfer Taxes paid by you within thirty (30) minutes after you have made the payment for the Transfer, unless such International Transfer has already been disbursed by us at the time of such oral or written cancellation request and (ii) you may be entitled to a full refund of the Transfer Amount and all Transfer Fees or Transfer Taxes paid by you if an error has occurred as set forth above or as otherwise provided under applicable law. Your rights regarding the Transfer are further explained under the applicable disclosures generated in connection with such International Transfer.

**Identification, Test Questions and Reference Numbers.** We reserve the right to require, and may be legally required to obtain, documentation that will identify you and/or any Receiver in connection with any purchase and/or use of our Services ("ID"). In some Agent locations, the Receiver may also be required to provide a test question answer, instead of ID, to receive the Transfer. Test questions may not be available in certain Agent locations or Expected Destinations. While you will receive a reference number that corresponds to your Transfer ("Reference Number"), such Reference Number is not always required to receive a Transfer where other identification means (such as ID receipt or test questions) are utilized. MoneyGram shall not have any liability in the event that the Transfer is disbursed, when and as applicable, to an individual who properly answers a test question, provides ID to the Agent describing such person as the Receiver (even if such ID was false or forged), or provides the Reference Number.

**Exchange Rate; Currency Availability.** In addition to the Transfer Fees applicable to your Transfer, if the Transfer is an International Transfer, a currency exchange rate may be applied. United States currency is converted to a foreign currency at an exchange rate set by us ("Exchange Rate"). The Exchange Rate described on any pre-transaction and post-transaction disclosures provided by MoneyGram to you has been rounded to the number of decimal places identified on such disclosures. The number of decimal places used by MoneyGram to convert the currency into foreign currency may be greater than that displayed on the disclosures. Any difference in the Exchange Rate disclosed to you in writing and the exchange rate received by MoneyGram will be kept by MoneyGram (and/or its Agents in some cases). Payouts will generally be made in the national currency of the Expected Destination ("Local Currency"). In some countries or territories you may designate a payout currency other than the Local Currency. The payout currency, whether expressed in the Local Currency or otherwise, shall be reflected in the pre-transaction and post-transaction disclosures. Because not all currencies are available in all Agent locations, please ask an Agent or contact us by visiting www.moneygram.com or calling 1-800-926-9400 for information regarding the currency Exchange Rate or the currencies available in the Expected Destination.

**LIABILITY.** UNLESS APPLICABLE LAW REQUIRES OTHERWISE, YOUR EXCLUSIVE AND MAXIMUM REMEDY AGAINST MONEYGRAM IS REFUND OF THE TRANSFER AMOUNT PLUS ANY TRANSFER FEES CHARGED BY MONEYGRAM. NO OTHER REMEDY IS AVAILABLE TO YOU, INCLUDING, BUT NOT LIMITED TO ANY REMEDY FOR INCIDENTAL, INDIRECT, SPECIAL OR CONSEQUENTIAL DAMAGES. THESE LIMITATIONS APPLY WHETHER YOUR CLAIM ARISES DUE TO MONEYGRAM OR ITS AGENTS' NEGLIGENCE, OTHER FAULT, ERROR, OMISSION OR NON-PERFORMANCE. WE ACCEPT NO RESPONSIBILITY FOR THE ACTS OR OMISSIONS OF A RECEIVER'S BANK, SERVICE PROVIDER OR THEIR DESIGNEES.

**ARBITRATION.** UNLESS OTHERWISE SPECIFIED BY APPLICABLE LAW, ANY CONTROVERSY OR CLAIM ARISING OUT OF OR RELATING TO THE TRANSFER, THE AGREEMENT OR BREACH OF THIS AGREEMENT, INCLUDING STATUTORY CONSUMER CLAIMS, SHALL BE SETTLED BY ARBITRATION ADMINISTERED BY THE AMERICAN ARBITRATION ASSOCIATION ("AAA") UNDER ITS COMMERCIAL ARBITRATION RULES. JUDGMENT ON THE ARBITRATION AWARD MAY BE ENTERED IN ANY COURT HAVING JURISDICTION THEREOF. ANY SUCH ARBITRATION SHALL BE INITIATED AND HELD IN THE OFFICE OF THE AAA CLOSEST TO THE AGENT LOCATION WHERE YOU INITIATED THE TRANSFER. EACH PARTY SHALL BEAR ITS OWN COSTS AND FEES FOR EXPERTS AND ATTORNEYS, AND NO PARTY SHALL HAVE A RIGHT TO PARTICIPATE AS A MEMBER OF ANY CLASS OF CLAIMANTS. THIS EXCLUSIVE ARBITRATION REMEDY SHALL NOT BE AVAILABLE UNLESS INITIATED WITHIN ONE YEAR AFTER THE CONTROVERSY OR CLAIM AROSE.

**General.** This Agreement is governed by Minnesota law without regard to its conflicts of law rules, supersedes all prior agreements or understandings between you and MoneyGram, and cannot be modified orally. In the event of any conflict between the English version of our Agreement with you and any non-English version, the English version shall control and govern. Services are directed to persons 18 years and over, may not be used for escrow purposes or gambling, and may only be used for a lawful purpose. You represent, warrant and acknowledge to MoneyGram that (i) all information you supply to us as part of this Agreement is truthful, accurate and complete, (ii) you have received and reviewed a pre-transaction disclosure and/or receipt in connection with your purchase of Services and that the information contained on such documentation is complete and accurate and (iii) your use of the Services does not violate any law, including without limitation, laws relating to money laundering, illegal gambling activities, support for terrorist activities or fraud. You shall indemnify MoneyGram and its Agents for all losses of any kind (including attorneys fees) arising out of any breach of the Agreement by you or by the Receiver. MoneyGram may refuse to provide Services to any person.

**Privacy Notice; Sharing of Information.** MoneyGram may disclose your personal information to third parties as outlined in the MoneyGram Privacy Statement, which is available on our website at www.moneygram.com or by calling 1-800-926-9400. Disclosed information may include, but is not limited to, your contact information, your identification, information about the Transfer or your use of the Services, or other information relating to financial matters. The information may be disclosed to financial institutions, our Agents, our service providers, or governmental or other regulatory agencies (including law enforcement officials within or outside of the United States), and direct marketers. To opt out of receiving information about our products and services, email marketingpreferences@moneygram.com or call 1-800-926-9400. To help protect your personal information, we endeavor to use reasonable security measures.

6 81131 11933 7 ©2015 Wal-Mart Stores, Inc. | 553661027  ✿SSB

APPENDIX B

(English version only, 2016 Terms and Conditions)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| JONATHAN FISHER, <br><br>     Plaintiff and Respondent, <br><br>        v. <br><br> MONEYGRAM INTERNATIONAL, INC., <br><br>     Defendant and Appellant. | A158168 <br><br> (Alameda County Super. Ct. No. RG19009280) <br><br> **ORDER GRANTING REQUEST TO CERTIFY OPINION FOR PUBLICATION** |

THE COURT:

The opinion in the above-entitled matter filed on June 29, 2021, was not certified for publication in the Official Reports. Julian Hammond of HammondLaw, P.C., counsel for respondent, filed a request that the opinion be published. For good cause it now appears that the opinion should be published in the Official Reports and it is so ordered.

Dated: July 27, 2021                        STREETER, Acting P. J.

1

Trial Court:    Alameda County Superior Court

Trial Judge:    Hon. Winifred Y. Smith

Counsel:    Norton Rose Fulbright US, Eric A. Herzog, Michelle L. Carter; Wolfe & Wyman, Brian H. Gunn, for Defendant and Appellant.

HammondLaw, Julian A. Hammond, Polina Brandler; Goldstein, Borgen, Dardarian & Ho, Laura L. Ho, Anne P. Bellows; Katz, Marshall & Banks, Daniel B. Edelman, *pro hac vice*, for Plaintiff and Respondent.